**JAN DAVID KAROWSKY**
Attorney at Law
A Professional Corporation
California State Bar Number 53854
716 19th Street, Suite 100
Sacramento, CA 95811-1767
KarowskyLaw@sbcglobal.net
(916) 447-1134
(916) 448-0265 (Fax)

Attorney for Defendant
Brian Dempsey

# UNITED STATES DISTRICT COURT

# IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>Brian Dempsey,<br><br>　　　　Defendant | Case No. 2:16-Cr.-119-JAM<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS THE INDICTMENT BASED ON OUTRAGEOUS GOVERNMENT CONDUCT**<br><br>Date:　September 11, 2023<br>Time:　9:00 a.m.<br>Judge:　The Honorable Senior Judge<br>　　　　John A. Mendez |

TO: PHILLIP A. TALBERT, United States Attorney and Heiko Coppola, Assistant United States Attorney:

**PLEASE TAKE NOTICE** that on September 11, 2023 at 9:00 a.m., in the Courtroom of the Honorable John A. Mendez, Senior U.S. District Judge, defendant Brian Dempsey, through his counsel of record, will and hereby does move this Court for an order dismissing the Indictment against him based on outrageous government conduct

for the reasons set forth in the attached memorandum in support of this motion. This motion is based on the instant motion, the attached Memorandum in support of the motion, the record in this case, and any argument or evidence presented before or at the hearing on this motion.

DATED: July 22, 2023                     Respectfully submitted,

                                                     JAN DAVID KAROWSKY
                                                     Attorney at Law
                                                     A Professional Corporation

                                                     /s/ Jan David Karowsky

                                  by
                                                     JAN DAVID KAROWSKY
                                                     Attorney for Defendant
                                                     Brian Dempsey

## POINTS AND AUTHORITIES IN SUPPORT OF THE MOTION

Statement of Facts

I, Brian A. Dempsey, am the defendant in the instant case and do hereby declare, under penalty of perjury, that the foregoing is true and correct:

On August 22, 2013, an FBI agent approached me while I was trying make my airline connection to fly back to the United States from the airport in Rome and informed me I had been placed on a no-fly list and would not be allowed to fly to any location in the United States. The FBI agent, who I later learned was Jason Fickett, told me directly that I would not be allowed to return to the United States until I spoke with him. Not

knowing the law or my rights in the United States let alone in Europe, I agreed to speak with him.

I remember another person being with Agent Fickett who did not identify himself but, by where he stood and what he did during the time I was being interviewed, appeared to be with Fickett. In fact, when Fickett told me he wanted to see my cell phone, he directed me to give it to this other person.

At the same time, Agent Fickett then informed me I needed to speak with him a "second" time; immediately after I had already spoken to him. I refused.

Then, my family retained attorney Mark Reichel for me. After a number of conversations with Mr. Reichel between August, 2013 and January, 2014 in which Reichel changed his opinion whether I should speak to the government again or not, he finally told me he had negotiated immunity for me and I needed to cooperate in a series of interviews with a prosecutor and FBI agents, after which, I would be allowed to return home.

Additionally, Mr. Reichel instructed me to go to the American Embassy in Rome in August 2013 to file for Repatriation. I was refused the paperwork when I arrived. Instead, SA Fickett came out from the back and again stated I wasn't going home until I talked to him a second time. I refused again.

Subsequently, Mr. Reichel asked my brother Jim for a significantly larger retainer. Since Reichel had not done anything to return me to the U.S., my brother fired him. Mark Reichel's last statement to me the day he was fired was if you talk to the Feds again you will go to jail for 30 years!.

I then returned to Syria since I had nowhere else to go. My friend was still there and I couldn't go home. Furthermore, I'm not accused of doing anything wrong or illegal in Syria either time nor did I do anything wrong or illegal while there either time,

Subsequently, Reichel recontacted me while I was in Syria; said he was still going to be my lawyer; that I could go home; but that I couldn't leave Syria until the Feds gave me permission to do so; and that I needed to cooperate and be interviewed by an Assistant United States Attorney.

I was interviewed in Rome by ASUA Jean Hobler and others on the dates of January 7th, 8th, 9th, and 11th, 2014. I was told I was free to leave the last interview and I did. I am alleged to have made some statements during the four days of interviews which conflicted with those made to Agent Fickett.After the interviews, Mr. Reichel and AUSA Hobler told me, separately, they wanted me to cooperate with the government in their prosecution of the person I went to Syria with, Terry Ingram. In fact, Ms. Hobler instructed me to go to the U.S. Embassy in Rome on a particular date in February, 2014, at which time I was met by an FBI agent who presented me with a written, formal plea agreement which he explained offered a prison sentence of 10 -16 months with a minimum sentence of one year in prison. He told me I would be required to take a lie detector test and that I would be required to cooperate with the government in their prosecution against Ingram; and then I was going to be required to do "other things," which were not explained to me.

I called Reichel and confronted him with the fact he had indicated he had obtained immunity for me. To say the least, I was angry at Reichel. Reichel said he would try to

get me a better deal and get me home. I told him I didn't want a better deal. I wanted the immunity he had promised and to return home. Reichel made no effort to get me off the no-fly list.

I had spoken to SA Fickett; I agreed to and was interviewed by AUSA Hobler for the better part of four days; I had followed instructions and gone to the U.S. Embassy twice – to get repatriation papers and then when I was presented with a proposed plea agreement, and still neither the FBI nor the government would allow me to return home.

For three years and seven days - from January 11, 2014 to January 18, 2017, the date I was ultimately arrested on a criminal warrant from the United States District Court, Eastern District of California, I literally wandered around Europe and ultimately England, with no ability legally to work and no real means by which to support myself.

Sometimes I would be allowed to stay in mosques or would "couch surf" with strangers I might meet who took pity on me. Otherwise, most of the time I was literally homeless. I would sleep on park benches, frequently crying myself to sleep and eating when I could – sometimes not at all. I lost over 70 pounds during the time I was on the streets of Europe and England.

On information and belief, I allege, based on the declaration of AUSA Jean Hobler used for the purpose of having me arrested and extradited back to the United States from London[1], an Indictment against me from a Grand Jury was not sought until June 23, 2016, which was two years, 5 months, and 12 days from when I had been interviewed in

---

[1] A copy of the declaration of AUSA Jean Hobler and attachments is attached hereto as Exhibit A and incorporated here by this reference.

Rome. Eventually, I was arrested and placed in custody in London on January 18, 2017, which was three years and seven days I had been wandering around Europe with no ability to support myself or return home.

I was returned to the United States in 2020. The government initially moved for my detention and I was detained, with multiple tries by my attorneys to obtain my release over the years until this Court ordered and I was released on May 25, 2023. By then, I had served not only more time than the government ever had sought against me, but 92.5% of the total time one would actually serve on a statutory maximum sentence of 8 years. My attorney has informed me he believes I have served more time on the pending charge than any other person ever.

Furthermore, while in custody in the Eastern District, on or about April 4, 2022, I was offered a plea agreement which required I plead guilty to a violation of 18 U.S.C. § 1001, making false statements in a matter within the jurisdiction of executive branch of the United States Government, involving international terrorism. At that time, I refused to enter such a plea, largely because I did not believe then nor do I believe now that anything I did *involved international terrorism.* Mr. Olmos, one of my prior attorneys and Mr. Karowsky also informed me the government had stated it would **never** agree to strike the allegation regarding international terrorism.

Then, on June 26, 2023, after the case had been set for trial in September, Mr. Karowsky informed me the government would now allow me to plead to the false statements charge and agree to drop the international terrorism allegation.

Lastly, I spent over two years in solitary confinement on 8 west at the Sacramento County Jail. Many days I was not allowed out of my cell at all. On a number of days, I was only allowed out for only thirty minutes in a 24 hour period. Jail Classification refused to take me off of "administrative segregation," claiming I was a terrorist. By the jails own rules, as far as I understood them, I should not have been kept on administrative segregation for more than 30 days without individual interviews with the Commander. During my entire incarceration, I never had one writeup.

I declare under penalty of perjury that the preceding is true and correct and as to the information on which I have alleged on information and belief, I believe it to be true. Executed on July 22, 2023 at Sacramento County, California.

/s/ Brian A. Dempsey, Sr.

**Argument**

**The Law**

The assertion of "outrageous government conduct" is an argument that the government's actions were so fundamentally unfair as to require dismissal of the charges. The Supreme Court in *United States v. Russell*, 411 U.S. 423, 431, 93 S.Ct. 1637, 1642, 36 L.Ed.2d 366 (1973) (Russell), recognized that "… we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction...." In *Hampton v. United States*, 425 U.S. 484, 48 L. Ed. 2d 113, 96 S. Ct. 1646, (1976), a plurality of justices reaffirmed the Court's earlier statement in

*Russell.* 425 U.S. at 495-97, 96 S. Ct. at 1652-54 (Powell J., concurring); (Brennan, J., dissenting). Thus, "apart from any question of predisposition of a defendant to commit the offense in question, governmental participation may be so outrageous or fundamentally unfair as to deprive the defendant of due process of law...." *United States v. Quinn*, 543 F.2d 640, 648 (8th Cir.1976). Resolution of that issue is, however, solely a question of law for the court. *Ibid*. See also *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978) (dismissing indictment based on outrageous government conduct defense when government agents were involved in the crime from beginning to end); *United States v. Batres-Santolino*, 521 F. Supp. 744 (N.D. Cal. 1981) (dismissing indictment based on outrageous government conduct defense when the government agents "manufactured" the crime).

"Outrageous government conduct is not a defense, but rather a claim that government conduct in securing an indictment was so shocking to due process values that the indictment must be dismissed." *United States v. Montoya*, 45 F.3d 1286, 1300 (9th Cir.1995). The government action must violate the universal sense of justice. Id.

When government conduct is so grossly shocking and so outrageous that it violates a universal sense of justice, due process under the Fifth Amendment warrants dismissal of an indictment. See *United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir.1983).

The only case in which the Ninth Circuit has found such a due process violation, *Greene v. United States*, 454 F.2d 783, 786-87 (9th Cir.1971), the government provided ingredients and was the sole customer for the defendant's bootleg whiskey. In *Greene*,

the Defendants were convicted in the United States District Court for the Eastern District of California, Thomas J. MacBride, Chief Judge, on charges involving possession of unregistered distilling apparatus, sale without stamp of distilled spirits, and conspiracy. The Court of Appeals held that where a government special investigator reestablished contact with defendants after their arrest on former bootlegging charges, offered to supply equipment and an operator for a still, supplied sugar at wholesale, urged defendants to resume production, and acted as only customer for the illicit liquor, the government thereby directly and continuously over a 2 1/2 year period involved itself in the creation and maintenance of bootlegging operations and was so enmeshed in criminal activity that it was barred from prosecuting defendants.

The Court held in *Greene*, "(W)e do not believe the Government may involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators.  As pointed out in *Sherman v. United States*, *supra*, 356 U.S. 369 at 372, 78 S.Ct. 819 at 821, a certain amount of stealth and strategy 'are necessary weapons in the arsenal of the police officer.' But, although this is not an entrapment case, when the Government permits itself to become enmeshed in criminal activity, from beginning to end, to the extent which appears here, the same underlying objections which render entrapment repugnant to American criminal justice are operative.  Under these circumstances, the Government's conduct rises to a level of "creative activity" (*Sherman, supra*, at 372, 78 S.Ct. at 821), substantially more intense and aggressive than the level of such activity charged against

the Government in numerous entrapment cases we have examined." *U.S. v. Greene*, 454 F.2d 783, 787).

The instant case appears to be the next case for the application of the doctrine of outrageous government conduct in the Ninth Circuit.

American citizens have a constitutional right to travel. The right to travel is a part of the "liberty" of which a citizen cannot be deprived without due process of law under the Fifth Amendment. *Kent v. Dulles*, 357 U.S. 116, 125-127 (1958); see also *Aptheker v. Secretary of State*, 378 U.S. 500, 517 (1964) ("freedom of travel is a constitutional liberty closely related to rights of free speech and association"). By not providing Mr. Dempsey with any notice or opportunity for a fair hearing in which to contest his placement on a no-fly list, he was deprived of his constitutional right to travel and repatriation literally without due process of law.

In fact, legislation and administrative procedures were in place in January, 2014 to permit individuals to challenge their inclusion on the No-Fly List. (See 49 U.S.C. §§ 44903(j)(2)(C)(iii)(I); (j)(2)(G)(i); 44926(a), (b)(1); 49 C.F.R. §§ 1560.201-207).

When a U.S. citizen was denied boarding in a foreign country due to apparent inclusion on the No-Fly List, the U.S. government was legislatively required to help them secure approval to return to the United States via a commercial flight. By law, the government was prohibited from using the No-Fly List to prevent U.S. citizens from returning home to U.S. territory.

However, the government did nothing to inform or assist Mr. Dempsey to challenge his placement on the No-Fly List or to secure his return to the United States.

Instead, the government either purposefully or by gross negligence, allowed and caused Mr. Dempsey to be homeless and penniless in Europe for over three years.

To not provide Mr. Dempsey with any notice or opportunity for a hearing in which to challenge his placement on a no-fly list; to refuse to allow Mr. Dempsey to return to the United States; to knowingly leave him on the streets of Europe with no means by which he could support himself for over three years before indicting and having him arrested; to refuse to agree to dismiss the international terrorism enhancement for over five years and then agree to do so within sight of a trial, after demanding Mr. Dempsey stay in custody so that he has served virtually all of an eight year statutory sentence is so shocking and outrageous as to both literally and figuratively violate due process of law.

Conclusion

For all the reasons cited, the Court must dismiss the Indictment.

DATED:  July 22, 2023                         Respectfully submitted,

                                              JAN DAVID KAROWSKY
                                              Attorney at Law
                                              A Professional Corporation

                                              /s/ Jan David Karowsky

                             by
                                              JAN DAVID KAROWSKY
                                              Attorney for Defendant
                                              Brian Dempsey