**JAN DAVID KAROWSKY**
Attorney at Law
A Professional Corporation
California State Bar Number 53854
716 19th Street, Suite 100
Sacramento, CA 95811-1767
KarowskyLaw@sbcglobal.net
(916) 447-1134
(916) 448-0265 (Fax)

Attorney for Defendant
Brian Dempsey

## UNITED STATES DISTRICT COURT

## IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America,<br><br>  Plaintiff,<br><br>vs.<br><br>Brian Dempsey,<br><br>  Defendant | Case No. 2:16-Cr.-119-JAM<br><br>**NOTICE OF MOTION AND MOTION TO SUPPRESS MR. DEMPSEY'S STATEMENTS TO THE FBI AND AT LAW ENFORCEMENT INTERVIEWS IN JANUARY, 2014 BASED ON THE FACT SAID STATEMENTS WERE INVOLUNARILY OBTAINED**<br><br>**Date:** September 11, 2023<br>**Time:** 9:00 a.m.<br>**Judge:** The Honorable Senior Judge John A. Mendez |

TO:   PHILLIP A. TALBERT, United States Attorney and Heiko Coppola, Assistant United States Attorney:

**PLEASE TAKE NOTICE** that on September 11, 2023 at 9:00 a.m., in the Courtroom of the Honorable John A. Mendez, Senior U.S. District Judge, defendant Brian Dempsey, through his counsel of record, will and hereby does move this Court for

- 1 -

an order suppressing the statements allegedly made by Mr. Dempsey to an FBI agent on August 22, 2013 at the airport in Rome and those statements made by him on January 7th, 8th, 9th, and 11th, 2014 based on the fact these statements and all of them were taken involuntarily and for the reasons set forth in the attached memorandum in support of this motion. This motion is based on the instant motion, the attached Memorandum in support of the motion, the record in this case, and any argument or evidence presented before or at the hearing on this motion.

DATED: July 22, 2023                                       Respectfully submitted,

JAN DAVID KAROWSKY
Attorney at Law
A Professional Corporation

/s/ Jan David Karowsky

by

JAN DAVID KAROWSKY
Attorney for Defendant
Brian Dempsey

## POINTS AND AUTHORITIES IN SUPPORT OF THE MOTION

**Statement of Facts**

I, Brian A. Dempsey, am the defendant in the instant case and do hereby declare, under penalty of perjury, that the foregoing is true and correct:

On August 22, 2013, an FBI agent approached me while I was trying make my airline connection to fly back to the United States from the airport in Rome and informed me I had been placed on a no-fly list and would not be allowed to fly to any location in the United States. The FBI agent, who I later learned was Jason Fickett, told me directly

that I would not be allowed to return to the United States until I spoke with him. Not knowing the law or my rights in the United States let alone in Europe, I agreed to speak with him then.

I remember another person being with Agent Fickett who did not identify himself but, by where he stood and what he did during the time I was being interviewed, appeared to be with Fickett. In fact, when Fickett told me he wanted to see my cell phone, he directed me to give it to this other person.

At the same time, Agent Fickett then informed me I needed to speak with him a "second" time; immediately after I had already spoken to him. I refused.

Then, my family retained attorney Mark Reichel for me. After a number of conversations with Mr. Reichel between August, 2013 and January, 2014 in which Reichel changed his opinion whether I should speak to the government again or not, he finally told me he had negotiated immunity for me and I needed to cooperate in a series of interviews with a prosecutor and FBI agents, after which, I would be allowed to return home.

I was interviewed in Rome by ASUA Jean Hobler and others on the dates of January 7th, 8th, 9th, and 11th, 2014. I was told I was free to leave the last interview and I did. I am alleged to have made some statements during the four days of interviews which conflicted with those made to Agent Fickett.

After the interviews, Mr. Reichel and AUSA Hobler told me, separately, they wanted me to cooperate with the government in the prosecution of the person I went to Syria with, Terry Ingram. In fact, Ms. Hobler instructed me to go to the U.S. Embassy in

Rome on a particular date in February, 2014, at which time I was met by an FBI agent who presented me with a written, formal plea agreement which he explained offered a prison sentence of 10- 16 months with a minimum sentence of one year in prison. He told me I would be required to take a lie detector test and that I would be required to cooperate with the government in their prosecution against Ingram; and then I was going to be required to do "other things," which were not explained to me.

I called Reichel and confronted him with the fact he had told me he had obtained immunity from prosecution for me. To say the least, I was angry at Reichel. Reichel said he would try to get me a better deal and get me home. I told him I didn't want a better deal. I wanted the immunity he had promised and to return home. Reichel made no effort to get me off the no-fly list.

The only reason I spoke to Special Agent Fickett on August 22, 2013 was because he specifically informed me that I had been placed on a No-Fly List and would not be allowed to return home until I spoke with him.

Moreover, the only reason I agreed to and participated in the four days of interviews by the AUSA and FBI in January, 2014 was because Mr. Reichel had indicated to me he had obtained immunity from prosecution for me and I would be allowed to return home after the interviews were conducted. Otherwise, I would not have spoken to Special Agent Fickett or allowed myself to be interviewed by AUSA Hobler.

I declare under penalty of perjury that the preceding is true and correct and as to the information on which I have alleged on information and belief, I believe it to be true. Executed on July 22, 2023 at Sacramento County, California.

/s/ Brian A. Dempsey, Sr.

**The Law**

The government must establish that challenged statements were made voluntarily. *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991). Involuntary statements are inherently untrustworthy, and the use of such statements violates the fundamental sense of decency. *Spano v. New York*, 360 U.S. 315, 320-21 (1959).

> Even noncustodial interrogations may, in special circumstances, produce involuntary confessions. *United States v. Swint*, 15 F.3d 286, 289 (3rd Cir. 1994). The trial court must determine 'whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne.' *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). The court must inquire into 'both the characteristics of the accused and the details of the interrogation.' *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). 'Courts must weigh, rather than simply list, the relevant circumstances, and weigh them not in the abstract but against the power of resistance of the person confessing.' " *United States v. Preston*, 751 F.3d 1008, 1017 (9th Cir. 2014) (quoting *Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011)).
>
> *United States v. Mendiola*, 2014 U.S. Dist. LEXIS 117678, *23-24.

A court must consider the "totality of the circumstances," focusing both on the nature of the accused and the "techniques" used by the police officers. See, e.g., *United States v. Swint*, *Id.* at 289.

As the Court stated in *Miller v. Fenton*, 474 U.S. 104, 116 (1985). "[T]he admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to [a particular] suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne [i.e., whether his confession was a product of his free will].

The constitutional standard has both objective and subjective components. See, e.g., *United States v. Miggins*, 302 F.3d 384, 397 (6th Cir. 2002) (looking both at whether the interrogation techniques were "objectively coercive" and also at whether the techniques were the "crucial motivating factor" that led the defendant to confess) (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)).  The standard applies equally "whether a confession is the product of physical intimidation or psychological pressure." *Townsend v. Sain*, 372 U.S. 293, 307 (1963).

With respect to challenged interrogation techniques, "[t]he [initial] question [for a court in assessing the voluntariness of a confession] is whether the technique used risks overcoming the will of the run-of-the-mill suspect, even if it did not overcome the will of this particular suspect." See *Collazo v. Estelle*, 940 F.2d 411, 426 (9th Cir. 1991) (en banc) (Kozinski, J., concurring).

The next line of inquiry is whether the "police conduct [was] causally related to the confession" -- a question that focuses on the suspect's subjective mental state. See *Colorado v. Connelly*, 479 U.S. 157, 164 (1986).

The Court repeatedly has suggested, however, that the second factor applies according to a sort of sliding scale -- the more egregious the interrogation "technique," the less focus on the second issue of whether the particular defendant's will was overborne by the police misconduct. See, e.g., *Miller*, *Id.* at 115-16; *Culombe v. Connecticut*, 367 U.S. 568, 603-05 (1961) (opinion of Frankfurter, J., announcing the judgment of the Court); *Blackburn v. Alabama*, 361 U.S. 199, 207-08 (1960). Thus, "certain interrogation techniques . . . are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, *Id.* 474 U.S. at 109; see also *Collazo*, *Id.* 940 F.2d at 426-27 (Kozinski, J., concurring) (noting that certain police interrogation techniques are so offensive as to violate the Due Process Clause even if statements were, in fact, voluntarily made).

In contrast to a confession made in violation of Miranda, an involuntary confession is not admissible for any purpose at trial, including for impeachment purposes, because it is irrefutably presumed to be unreliable. *Mincey v. Arizona*, 437 U.S. 385, 397-98 (1978). This rule applies even if the prosecution successfully shows that the confession is in fact true. *Rogers v. Richmond*, 365 U.S. 534, 540-41 (1961).

> Our decisions under that (the Fourteenth) Amendment have made clear that convictions following the admission into evidence of confessions which are involuntary, i. e., the product of coercion, either physical or psychological, cannot stand. This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system -- a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own

> mouth. See *Chambers v. Florida*, 309 U.S. 227; *Lisenba v. California*, 314 U.S. 219, 236; *Rochin v. California*, 342 U.S. 165, 172-174; *Spano v. New York*, 360 U.S. 315, 320-321; *Blackburn v. Alabama*, 361 U.S. 199, 206-207. And see *Watts v. Indiana*, 338 U.S. 49, 54-55.
>
> *Rogers v. Richmond*, 365 U.S. 534, 540-541 (1961)

**Mr. Dempsey's statements to the FBI Agent and to the AUSA must be suppressed**

Using a totality of the circumstances analysis, it is clear that but for Special Agent Fickett informing Mr. Dempsey that he would not be allowed to return home until he spoke with him, Mr. Dempsey would not have spoken to Special Agent Fickett nor to AUSA Hobler.

The Court must look at both whether the questioning techniques were "objectively coercive" and also at whether the techniques were the "crucial motivating factor" that led Mr. Dempsey to give the statement to Fickett and then be interviewed by AUSA Hobler. It is clear from his declaration herein, that but for Special Agent Fickett admonishing him that only after speaking with him would Mr. Dempsey be allowed to go home, he would not have spoken to him.

It is exceptionally coercive for a law enforcement agent to inform someone who is trying to catch his plane back to the United States that he could not do so until he spoke to the FBI Special Agent. That fact alone was the sole motivating factor that coerced Mr. Dempsey into speaking with Special Agent Fickett and untimately AUSA Hobler.

The technique used by Fickett of conditioning his return to the U.S. on speaking with him, set up a completely coercive situation in which anyone would have then spoken to the law enforcement agent. Clearly, Mr. Dempsey's will was overcome by the egregious and, in fact, false statement Special Agent Fickett made to Mr. Dempsey.

Moreover, attorney Reichel falsely advised Mr. Dempsey that he had to allow himself to be interviewed by the government after which he would be allowed to fly home. He also falsely advised him that he had obtained immunity for Mr. Dempsey so that he would not be prosecuted for anything he said at the interviews.

Again, but for this false advice, Mr. Dempsey would not have submitted to the series of interviews which now form the basis for the false statement Indictment. We are not arguing ineffective assistance of counsel. We are arguing the grossly negligent legal advice received by Mr. Dempsey compounded the governmental coercion which caused him to submit to these interviews/interrogations.

As the case law concludes, the interrogation technique used by Special Agent Fickett was so offensive to a civilized system of justice that it must be condemned under the Due Process Clause of the Fourteenth Amendment. Mr. Dempsey's statements to Special Agent Fickett and to AUSA Hobler must be suppressed.

DATED: July 22, 2023                    Respectfully submitted,

JAN DAVID KAROWSKY
Attorney at Law
A Professional Corporation

/s/ Jan David Karowsky

by

JAN DAVID KAROWSKY
Attorney for Defendant
Brian Dempsey